# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

**BAY VIEW CHAUTAUQUA**
**INCLUSIVENESS GROUP,**                     CASE NO. 17-cv-0622-PLM-RSK

      Plaintiff,

vs.                                          HON. Paul L. Maloney

**THE BAY VIEW ASSOCIATION OF**
**THE UNITED METHODIST CHURCH**, et al.,

      Defendants.

---

Sarah S. Prescott (P70510)              Michael S. Bogren (P34835)
SALVATORE PRESCOTT & PORTER, PLLC        PLUNKETT COONEY
Attorneys for Plaintiff                  Attorneys for Defendants
105 East Main Street                     950 Trade Centre Way, Suite 310
Northville, MI 48167                     Portage, MI 49002-0493
(248) 679-8711                           (269) 226-8822
prescott@spplawyers.com                  mbogren@plunkettcooney.com

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

NOW COMES Plaintiff, by and through its attorneys of record, and for its Response in Opposition to Defendants' Renewed Motion for Partial Judgment on the Pleadings, states as follows:

1. Defendants' limited, targeted Motion for Partial Judgment on the Pleadings asserts that Plaintiff lacks *associational* standing to seek one of the elements of relief prayed for in this matter, monetary damages.

2. However, Plaintiff does not require associational standing to seek monetary damages because it has direct standing in its own right.

3. Plaintiff owns outright the damages claims of the natural persons who make up its

membership, because those individuals irrevocably assigned all rights, title and interest they had to Plaintiff.

4.  Assignment to Plaintiff affords Plaintiff the right to pursue this matter for damages, as established in *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008).

5.  Under that controlling case, Defendants' motion may not be granted; Plaintiff has Article III and prudential standing to proceed and is the proper real party in interest.

6.  Further, Defendants argue that their action cannot be deemed "state action" because other statutes devolve even more municipal power than the 1889 statute that enabled Bay View, and that even if they are state actors, there is not a sufficient nexus between the power granted Bay View by the State and their discriminatory actions.

7.  Plaintiff has sufficiently pled that Bay View is a municipal entity under the 1889 statute, regardless of whether other statutes devolve even more state power; there is no law that requires an entity to possess "all" state power in order to be considered state action.

8.  Moreover, Bay View is a public entity and not required to show a nexus between the exercise of its state power and its discriminatory behavior.

9.  Even if it were a purely private entity and required to show such a nexus, Defendants have not and cannot show that Bay View's power to "control . . . property, real and personal" and its decision to impose a religious test for who can own real property in the town is an insufficient nexus.

10. Finally, Defendants argue that Plaintiff's Count V is precluded because of an earlier lawsuit between some members of Plaintiff and Bay View.

11. Plaintiff's Count V is not precluded because both the parties and the interests of the prior case are different.

12.   The plaintiffs in the prior case involved only members of Bay View, and this Plaintiff is made up of would-be members and owners as well.

13.   The sole issue litigated in the prior case was whether a bylaw requiring a two-thirds vote of the membership to alter specific bylaws was in conflict with a Michigan statute requiring a majority vote.

14.   The present suit does not concern itself with this issue, and the essential or operative facts are not identical.

WHEREFORE, Plaintiff urges the Court to DENY the pending motion.


Respectfully submitted,
SALVATORE PRESCOTT
& PORTER, PLLC

/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplawyers.com

Dated: May 21, 2018

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

**BAY VIEW CHAUTAUQUA**
**INCLUSIVENESS GROUP,**                    CASE NO. 17-cv-0622-PLM-RSK

      Plaintiff,

vs.                                         HON. Paul L. Maloney

**THE BAY VIEW ASSOCIATION OF**
**THE UNITED METHODIST CHURCH**, et al.,

      Defendants.

_____

Sarah S. Prescott (P70510)              Michael S. Bogren (P34835)
SALVATORE PRESCOTT & PORTER, PLLC       PLUNKETT COONEY
Attorneys for Plaintiff                 Attorneys for Defendants
105 East Main Street                    950 Trade Centre Way, Suite 310
Northville, MI 48167                    Portage, MI 49002-0493
(248) 679-8711                          (269) 226-8822
prescott@spplawyers.com                 mbogren@plunkettcooney.com

_____

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR <u>PARTIAL JUDGMENT ON THE PLEADINGS</u>

# TABLE OF CONTENTS

Table of Authorities ................................................................................................... iii

Introduction ................................................................................................................ 1

    Facts Related to the Nature of This Suit .................................................................. 2

    Pleadings as to the Plaintiff Association .................................................................. 3

    Damages at Issue ..................................................................................................... 4

Controlling Law .......................................................................................................... 5

Argument .................................................................................................................... 8

    I.    Plaintiff Has Standing to Sue for Damages, in Addition to Equitable Relief ................... 8

        A.    As Assignee of Claims of Its Individual Members, Plaintiff Has Standing to Sue *In Its Own Right,* and Does Not Require Associational Standing ............................. 8

        B.    Defendants' Other Standing Arguments Do Not Justify Dismissal of Plaintiff's Prayer for Money Damages .................................................................................... 11

            1.    Defendants Do Not Even Attempt to Show a Lack of Standing to Secure Money Damages After *Sprint* Based on the FHA and ELCRA ....................... 11

            2.    Defendants' Old, Superseded Case Law Cannot Alter *Sprint;* Plaintiff Has Standing to Obtain Money Damages Under 42 U.S.C. § 1983 .................. 12

            3.    There is No Timing Issue Here; Plaintiff's Operative Complaint is the Amended Complaint ................................................................................... 14

    II.    Defendants are State Actors ................................................................................ 17

        A.    The Powers Delegated to Bay View Under the 1889 Act are Sufficient to Establish It as a Municipal Entity Notwithstanding the Existence of Other Acts that Grant More Powers .................................................................................... 18

        B.    Bay View Is Not A Purely Private Entity, But Even If It Were, There Is A Sufficient Nexus Between Its Power To "Manage And Control … All Property" In Bay View And Its Discriminatory Religious Test for Property Ownership ................................................................................................. 18-19

    III.    Claim Preclusion Does Not Bar Count 5 .............................................................. 21

Relief Requested ...................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Adair v. State,* 680 N.W. 2d 386, 396 (Mich. 2004) ...................................................................12

*B. & V. Distrib. Co. v. Dotorre Cos., LLC*, 278 F. App'x 480, 487 (6th Cir. 2008) .....................15

*Bletz v. Gribble,* 641 F.3d 743, 747 (6th Cir. 2011) ........................................................................13

*Bowers v. Estate of Mounger,* 542 S.W.3d 470 (Tenn. Ct. App. 2017) ........................................17

*Bushnell, Inc. v. Brunton Co.,* 659, F.Supp.2d 1150, 1159-60 (D. Kan. 2009) ...........................17

*Certain Interested Underwriters at Lloyd's, London, England v. Layne*,
        26 F.3d 39, 42–43 (6th Cir. 1994) ......................................................................................5

*F.H. ex. Rel. Hall v. Memphis City Sch.,* 764 F.3d 638, 640 (6th Cir. 2014) ................................13

*Frontier Ins. Co. v. Blaty,* 454 F.3d 590, 592-93 (6th Cir. 2006) ..................................................13

*Gratiot Ctr., LLC v. Lexington Ins. Co.,* No. 16-CV-14144,
        2017 WL 6316909, at *3 fn. 4 (E.D. Mich. Dec. 11, 2017) ...............................................5

*In re Pazdzierz,* 459 B.R. 254 (E.D. Mich. 2011) ...........................................................................5

*Informatics Applications Grp., Inc. v. Shkolnikov,* 836 F. Supp. 2d 400, 412 (E.D. Va. 2011) ....17

*Jones v. State Farm Mutual Automobile Insur. Co.,*
        509 N.W.2d 829, 834 (Mich. Ct. App. 1994) ...................................................................24

*GAF Bldg. Materials Corp. v. Elk Corp.,* 90 F.3d 479, 483 (Fed. Cir. 1996) ...............................16

*Garrett v. Washington,* 886 N.W.2d 762, 766 (Mich. App. Ct. 2016) .........................................24

*Kile v. Int'l Truck & Engine Corp.,* 399 F. Supp. 2d 829, 834 (M.D. Tenn. 2005) .....................15

*Lee v. City of Columbus, Ohio,* 636 F.3d 245, 247 (6th Cir. 2011) ...............................................13

*Marsh v. Alabama,* 326 U.S. 501 (1946) .................................................................................. 20-21

*Mathews v. Diaz,* 426 U.S. 67, 75 (1976) ......................................................................................16

*McCord v. Bd. of Educ. Of Fleming Cty., Kentucky,* No. 17-5548,
        2018 WL 1724560, at *7 (6th Cir. Jan. 30, 2018) ............................................................19

*Monnell v. Department of Social Services of City of New York,* 436 U.S. 658 (1978) .................19

*Neighborhood Action Coalition v. City of Canton, Ohio,*
    882 F.2d 1012 (6th Cir. 1989) ........................................................................9

*Northstar Fin. Advisors Inc. v. Schwab Investments,*
    779 F.3d 1036, 1044-45, 1047 (9th Cir. 2015) ........................................ 15-17

*Randolph-Rand Corp. of N.Y. v. Shafmaster Co., Inc.,*
    No. CIV. 97-44, 1999 WL 814367, at *2 (D. N.H. Apr. 8, 1999)....................17

*Reichhold Chemicals, Inc. v. Travelers Ins. Co.*, 544 F. Supp. 645 (E.D. Mich. 1982).................5

*Rockwell Int'l Corp. United States,* 549 U.S. 457 (2007)..............................................16

*Silicon Graphics, Inc. v. ATI Techs., Inc.,* No. 06-C-611-C,
    2007 WL 5595952, at *10 (W.D. Wis. June 14, 2007) ...................................17

*Sloan v. City of Madison Heights,* 389 N.W. 2d 418, 422 (Mich. 1986)......................................23

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,* 554 U.S. 269 (2008).............................. *passim*

*Stanton v. Auto Owners Ins. Co.,* 2016 WL 6269614, at *4 (Mich. Ct. App. Oct. 25, 2016) .......24

*Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 209 (1972) ..................................12

*Venegas v. Mitchell,* 495 U.S. 82, 88 (1990) ................................................................13

*Warth v. Seldon,* 422 U.S. 490, 501, 515-516 (1975).................................................9, 14


**STATUTES**

42 U.S.C. § 1983............................................................................................... 1, 11-14
42 U.S.C. § 3601 *et seq.* (Federal Fair Housing Act) ..............................................3
42 U.S.C.A. § 206 ....................................................................................................14
42 U.S.C.A. § 3613.................................................................................................12
1889 Summer Resort Act.................................................................................. 2, 17-20
MCL § 32.2101 *et. seq.* (Elliott-Larsen Civil Rights Act)........................................3
MCL § 450.2488......................................................................................................25
MCL § 455.58-59, 61-62, 67-71, 215 .......................................................... *passim*

**RULES**

Federal Rule of Civil Procedure 15 .................................................................. 15-17
Federal Rule of Civil Procedure 17(a) .....................................................................5
Federal Rule of Civil Procedure 23 ...................................................................... 5-6
Federal Rule of Civil Procedure 42 .........................................................................7

## OTHER AUTHORITIES

6A Charles Alan Wright and Arthur R. Miller, *Application of the Real Party in Interest Rule—Assignments*, Fed. Prac. & Proc. Juris. § 1545 (3d ed.) ......................................................5

**INTRODUCTION**

Defendants' motion for partial judgment argues that the Plaintiff lacks *associational* standing to obtain money damages for its club members. This argument is irrelevant because it does not take into account that the natural persons who are members of the Plaintiff club have assigned Plaintiff their interests. The operative (amended) complaint in this matter clarifies that the individual natural persons who make up the Plaintiff club have irrevocably and wholly assigned all interest, ownership and title in their claims to Plaintiff. This places Plaintiff in the direct shoes of its members, and provides it standing to recover all the relief the club members could obtain, per a controlling Supreme Court case, *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269 (2008). In short, Plaintiff is asserting its own first-party rights, not third-party rights, and it has standing to do so. *Id.* at 285-290.

Defendants' motion also argues that they cannot be liable under § 1983 because they are not a state actor, and even if they were, their state action lacks a nexus to the violations claimed. This argument fails first because Plaintiff has claimed a plethora of facts to show that Bay View was granted sufficient state powers under its enabling statute to create it as a public, municipal entity, regardless of whether other statutes devolve even more state power. There is no law that requires an entity to possess "all" state power in order to be considered state action. Second, as a public entity, Bay View is not required to show a nexus between the exercise of its state power and its discriminatory behavior. But even if it were a purely private entity, the nexus between Bay View's state-granted power to "control . . . property, real and personal" and its decision to impose a religious test for who can own real property in the town is clear.

Finally, Defendants argue that Plaintiff's Count V is precluded because of an earlier lawsuit between some members of Plaintiff and Bay View. Plaintiff's Count V is not precluded because

both the parties and the issues of the prior case are different. First, the plaintiffs in the prior case involved only members of Bay View, and this Plaintiff is made up of would-be members and owners as well. Second, the sole issue litigated in the prior case was whether a bylaw requiring a two-thirds vote of the membership to alter specific bylaws of Bay View was in conflict with a Michigan statute requiring a majority vote. Because the present suit does not concern itself with this issue and the essential or operative facts are not identical, Bay View cannot insulate itself from judicial review of its other bylaws simply by claiming res judicata.

## FACTS RELATED TO THE NATURE OF THIS SUIT

In this procedural posture, the Court accepts well-pleaded claims as true, as Defendants properly recite in their renewed motion on page 2. Defs' Mot. for Part. J., ECF No. 37. The facts pled in this matter are the following:

The Bay View Association of the United Methodist Church is a community of cottages, lodgings, and multi-purpose buildings situated just northeast of Petoskey, Michigan. Am. Compl. ¶ 1, ECF No. 29. Bay View was organized under a unique Michigan law known as the 1889 Summer Resort Act. *Id.* at ¶¶ 2, 25. The Act delegates to summer resort associations substantial government powers, including the power to appoint a board of assessors, levy and collect taxes, create, make, and amend laws and regulations, and deputize a marshal to enforce those rules including by jail time or fines. *Id.* at ¶¶ 25-32; *see also* MCL § 455.67-71.

Defendant Bay View Association of the United Methodist Church owns all of the land in the community. Through Defendant Bay View Real Estate Management, Inc., Defendants lease plots to qualifying "Members," and those Members in turn individually own permanent dwellings there. *See* Am. Compl. ¶¶ 82-84, n.2. Hence, one must be a Member of Defendant Bay View Association of the United Methodist Church to buy a home in Bay View. *Id.* It is undisputed that

the homes in Bay View are individually owned and operated; for example, they are individually maintained and may be rented solely at the owner's discretion. *Id.* at ¶¶ 66, 90-92; *see also* Answer to Am. Compl., ECF No. 31.

Throughout its history, Bay View required Members to be of "good moral character." In the 1940's, however, Bay View's Board adopted a resolution limiting ownership for the first time to persons "of the white race and Christian." Am. Compl. ¶ 43. With time, this "criteria" was further refined to limit Catholic owners to a small quota as well. *Id.* at ¶ 46. Eventually the "white race" portion was removed from the membership criteria; as of 1986, however, prospective "Members" have not only had to espouse a Christian creed, but they also must prove their religiosity with a minister's letter. *Id.* at ¶ 47.

This suit alleges that the religious test for home ownership in Bay View violates the U.S. and Michigan Constitutions, the Federal Fair Housing Act (the "FHA," at 42 U.S.C. § 3601 *et seq.*) and Michigan's Elliott-Larsen Civil Rights Act (the "ECLRA," at MCL § 32.2101 *et. seq.*). Am. Compl. ¶ 4.

## PLEADINGS AS TO THE PLAINTIFF ASSOCIATION

Plaintiff is a club made up of individuals deprived of their legal rights because of Bay View's membership policies, joined in an association to collaborate in methods of bringing about change while preserving their community's long-term viability. *Id.* at ¶ 6. Members of Plaintiff include existing owners whose children and grandchildren cannot inherit Bay View cottages because they do not meet the religious test described more fully herein, a situation that interrupts a family tradition of as much as six generations. *Id.* at ¶ 7. Members also include individuals who seek to own homes in the community, but who are not practicing Christians and therefore cannot do so. *Id.* at ¶ 8. For example, one Member converted to Judaism, and for that reason was denied

membership and the right to be a co-owner and ultimately inherit her parents' cottage, which has been in the family for four generations. *Id.* at ¶ 88.

Members of Plaintiff also include existing owners who object to the membership criteria and to the refusal to allow non-Christians or non-practicing Christians to buy homes in Bay View. Some Members are devout Christians who own homes in Bay View and who seek, as part of the expression of their faith, to live in a religiously diverse and free community devoted to encounter, but they cannot do so under the current rules and practices. *Id.* at ¶ 9. Members also include existing owners who cannot pass their sizeable, illiquid asset—their Bay View cottage—to their spouses, due to the religious test. *Id.* at ¶ 10. Finally, Members include existing Bay View owners who cannot sell their cottage on the open market on commercially reasonable terms, and whose property values are negatively affected (on information and belief) by the challenged religious test, which restricts sales to a small segment of willing buyers. *Id.* at ¶ 11.

In the Amended Complaint, Plaintiff has clarified its standing to represent the above-mentioned individual, natural persons. The Amended Complaint contains the following true and correct allegation at Paragraph 12:

> The natural persons who make up the Plaintiff have irrevocably assigned, transferred and set over to the Plaintiff all rights, title and interest he/she/or they hold in the claims, demands and causes of action in this suit. The natural persons who make up the Plaintiff have appointed Plaintiff as his/her/their attorney-in-fact with authority to litigate this matter, and each has agreed to be bound by the results of the litigation. These assignments are non-transferable, and each natural club member has represented that he/she/they have not assigned the matter to any other such assignee.

## DAMAGES AT ISSUE

As Defendants properly recite on pages 6-7 of their renewed motion, Plaintiff complains that its members have suffered emotional and financial losses, and it seeks compensatory and punitive damages. It also seeks declaratory and injunctive relief, amounting to an Order to cease

and desist enforcing the practice of religious discrimination at Bay View. Defendants did not challenge this latter form of relief in their motion.

## CONTROLLING LAW

Federal Rule of Civil Procedure 17(a) requires that "[a]n action must be prosecuted in the name of the real party in interest." However, an action need "not necessarily be brought in the name of the person who ultimately benefits from the recovery." *Reichhold Chemicals, Inc. v. Travelers Ins. Co.*, 544 F. Supp. 645, 649 (E.D. Mich. 1982). The "real party in interest" is simply "the person who is entitled to enforce the right asserted under the governing substantive law." *Certain Interested Underwriters at Lloyd's, London, England v. Layne*, 26 F.3d 39, 42–43 (6th Cir. 1994).

Federal law, rather than Michigan law, applies to determine the ability to assign claims for collections purposes and the effect of doing so on Article III standing to sue in this Court. *See, e.g., Gratiot Ctr., LLC v. Lexington Ins. Co.*, No. 16-CV-14144, 2017 WL 6316909, at *3 n.4 (E.D. Mich. Dec. 11, 2017) (Ex. A).[1] As Judge Ludington summarized in that case, "[A]n assignment passes the title to the assignee so that the assignee is the owner of any claim arising from the chose [sic] and should be treated as the real party in interest under Rule 17(a)." *Id.*; *see also* 6A Charles Alan Wright and Arthur R. Miller, *Application of the Real Party in Interest Rule—Assignments*, Fed. Prac. & Proc. Juris. § 1545 (3d ed.) (citing *Sprint*, 554 U.S. at 284).

---

[1] In practice, this source-of-law issue is academic, since Michigan law and Federal law equally condone assignments of the right to sue. *See, e.g., In re Pazdzierz*, 459 B.R. 254, 260 (E.D. Mich. 2011), *aff'd and remanded,* 718 F.3d 582 (6th Cir. 2013) (reviewing Michigan's general approval of assignment); *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008) (recognizing that "history and precedents . . . make clear that courts have long found ways to allow assignees to bring suit" and that "there is a strong tradition specifically of suits by assignees for collection").

The effect of assignment is that it transfers standing to sue; the assignee fills the shoes of the assignor(s). *Sprint* so holds, and it is controlling here. 554 U.S. at 284. In fact, that case answers the very specific question of whether assignment of a claim can afford standing to collect money damages.

*Sprint* involved almost 1400 payphone providers who owned and operated thousands of pay phones. Federal law allegedly entitled these providers to collect certain fees from long-distance carriers for long-distance calls dialed on their phones. However, any one pay phone operator was too small to litigate over each unpaid long-distance fee. In *Sprint,* the operators assigned their claims to billing and collections firms called aggregators to bring suit on their behalf. The Court described the assignments as follows:

> [T]he payphone operator "assigns, transfers and sets over to [the aggregator] for purposes of collection all rights, title and interest of the [payphone operator] in the [payphone operator's] claims, demands or causes of action for 'Dial–Around Compensation' . . . due the [payphone operator] for periods since October 1, 1997." The Agreement also "appoints" the aggregator as the payphone operator's "true and lawful attorney-in-fact." The Agreement provides that the aggregator will litigate "in the [payphone operator's] interest." And the Agreement further stipulates that the assignment of the claims "may not be revoked without the written consent of the [aggregator]."

*Id.* at 554 U.S. at 272 (internal citations omitted). In that case, the aggregators later remitted all proceeds of the suit (by separate agreement) back to the payphone operator. *Id.*

The defendant long-distance carriers moved to dismiss, arguing that the aggregators lacked standing to sue, since they did not directly suffer an injury-in-fact and failed to meet the redressability requirements for Article III standing, as they had no personal/direct stake in the outcome. Defendants further argued that even if there were constitutional standing, the case should be rejected and dismissed on prudential standing grounds. Defendants finally argued that the assignments were defunct attempts to circumvent the class action requirements of Federal Rule of

Civil Procedure 23.

The Court rejected each of these arguments in turn, to hold that indeed the plaintiff aggregator stood in the shoes of the individual assignors and could collect money damages. Citing the language of the assignment, the Court considered the claims to be transferred to and owned by the plaintiff/assignee "lock stock and barrel," meaning that the transfer of the injury and resulting claim was complete. *Id.* at 286. In short, the assignees *became* the injured parties because of the assignments; they were asserting "legal rights of their own," rather than derivative rights of others. *Id.* at 290.

Moreover, for purposes of assessing Article III standing redressability, the fact that the assignment was for collection purposes only was not controlling. What the plaintiff did or planned to do with the proceeds was legally irrelevant: "a legal victory would unquestionably redress the injuries for which the aggregators bring suit . . . whether the aggregators remit the litigation proceeds to the payphone operators, donate them to charity or use them to build new corporate headquarters." *Id.* at 287. Finally, the Court rejected the notion that this sort of aggregation of claims improperly "circumvented" class action rules. Assignment simply offers a parallel method of bringing suit.[2] The Court held, "Because the federal system permits aggregation by other means, we do not think that the aggregators should be denied standing simply because the payphone operators chose one aggregation method over another." *Id.* at 291. The Court went on to catalogue the ways joinder rules, consolidation under Federal Rule of Civil Procedure 42, and similar tools

---

[2] The Court also noted that "federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit. Trustees bring suits to benefit their trusts; guardians ad litem bring suits to benefit their wards; receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suit to benefit testator estates; and so forth." *Id.* at 287-288.

afford alternatives to class actions, such that in fact there are "several methods by which multiple similarly situated parties get similar claims resolved at one time and in one federal forum." *Id.*

In sum, "Lawsuits by assignees, including assignees for collection only, are 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process,'" as is required to afford standing. *Id.* at 286-287.

## ARGUMENT

### I. Plaintiff Has Standing to Sue for Damages, in Addition to Equitable Relief.

#### A. As Assignee of Claims of Its Individual Members, Plaintiff has Standing to Sue *In Its Own Right*, and Does Not Require Associational Standing.

In assessing this motion, it is first worth noting what Defendants do *not* argue. First, Defendants do *not* argue that the human individuals who are members of Plaintiff lack standing to sue in their own right to correct the alleged unlawful practices at issue in this suit.[3] Second, Defendants do *not* argue that Plaintiff lacks associational standing to sue for injunctive and declaratory relief, such as an order compelling Defendant to discontinue imposing its religious test for property ownership within Bay View. Rather, per Defendants, "The Plaintiff lacks standing to assert a claim ***for damages*** on behalf of its individual members." Defs' Mot. for Part. J. 7 (header, emphasis added, capitalization removed). The theory of the motion is that "associations do not have standing to assert ***damages claims*** on behalf of individual members . . . " *Id.* at 12 (emphasis added). In short, the dispute here is about ***associational*** standing ***to obtain monetary relief***, and

---

[3] The owner individuals who are part of Plaintiff are directly injured (in addition to emotionally) by having the value of their properties artificially depressed due to the religious test restricting the pool of ready buyers and preventing descent and devise to non-Christian or non-practicing Christian children, grandchildren and spouses. Non-owner individuals who are part of Plaintiff include ready and willing buyers who cannot purchase a home in Bay View due to the unlawful religious test. Removal of the religious test would redress these injuries directly and meaningfully, and Defendants do not dispute as much.

this response addresses specifically that issue.

Defendants' motion cannot be granted because Plaintiff need not establish that associations can sue for money for others; that simply is not Plaintiff's situation. Plaintiff is seeking money that belongs to it, not to anyone else. It has been assigned operative, live damages claims and therefore has standing in its own right, filling the shoes of the individual assignors.

The cases Defendants cite cannot aid this Court because they do not involve such a situation. Rather, they involve suits by would-be parties without an injury seeking to sue only *on behalf of* someone else. One example is *Warth v. Seldon*, where, in Defendants' own excerpt at page 10 of its motion, the Supreme Court noted that the would-be association plaintiff "alleges no monetary injury to itself, *nor any assignment of the damages claims of its members*. No award therefore can be made to the association as such." 422 U.S. 490, 515-516 (1975) (emphasis added). In other words, because that case did not involve the assignments this case involves, there was no standing. But that does not equate to disallowing assignments or finding no standing where assignment has occurred. If anything, the "therefore" in the *Warth* quote above indicates that standing would have obtained if an assignment were in place. Defendants' other cited authority, *Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012 (6th Cir. 1989) likewise involved no assignments and therefore simply does not speak to the effect of assignments on standing. Indeed, no case Defendants cite establishes that the assignments here are not sufficient to afford standing.

By contrast, Plaintiff cites directly controlling Supreme Court precedent approving assignments as a means to afford standing. Specifically, the assignments to the Plaintiff copy exactly the approved language of assignment from *Sprint*, and not by accident. As in that case, the instrument used here transferred to Plaintiff full and exclusive ownership of the claims of the

assignors and all rights to recover for them.

This means the Plaintiff is asserting its ***own*** legal rights here, not associational rights. Just as the aggregators in *Sprint* had constitutional and prudential standing and were permitted to pursue claims standing in the shoes of their assignors, this Plaintiff is entitled to collect—because it owns outright—the damages claims of its club members and assignees.

The U.S. Supreme Court explained:

> It is, of course, true that the aggregators did not originally suffer any injury caused by the long-distance carriers; the payphone operators did. But the payphone operators assigned their claims to the aggregators lock, stock, and barrel. And within the past decade we have expressly held that an assignee can sue based on his assignor's injuries. In *Vermont Agency, supra,* we considered whether a *qui tam* relator possesses Article III standing to bring suit under the False Claims Act, which authorizes a private party to bring suit to remedy an injury (fraud) that the United States, not the private party, suffered. We held that such a relator does possess standing. And we said that is because the Act "effect[s] a partial assignment of the Government's damages claim" and that assignment of the "United States' injury in fact suffices to confer standing on [the relator]." Indeed, in *Vermont Agency* we stated quite unequivocally that "the assignee of a claim has standing to assert the injury in fact suffered by the assignor."
>
> ***
>
> Finally, we note, as a practical matter, that it would be particularly unwise for us to abandon history and precedent in resolving the question before us. Were we to agree with petitioners that the aggregators lack standing, our holding could easily be overcome. For example, the Agreement could be rewritten to give the aggregator a tiny portion of the assigned claim itself, perhaps only a dollar or two. Or the payphone operators might assign all of their claims to a "Dial–Around Compensation Trust" and then pay a trustee (perhaps the aggregator) to bring suit on behalf of the trust. Accordingly, the far more sensible course is to abide by the history and tradition of assignee suits and find that the aggregators possess Article III standing.

*Sprint*, 554 U.S. at 286, 289 (internal citations omitted). This analysis is controlling here.

Finally, at page 15 of their motion, Defendants attempt to distinguish the assignments in *Sprint* by arguing that the Supreme Court "relied" on the fact that those assignments were "for ordinary business purposes" and not to "manufacture standing." *Sprint* says nothing, however,

about what would make assignments for purposes of claim aggregation non-"ordinary." The current assignments were made for the same purpose of aggregation as were the assignments approved in *Sprint*, and there is nothing before this Court to suggest this case should be decided differently. Nor is this a situation in which civil rights claims have been "bought and sold," as Defendants imply. They have not been bought or sold, and that concept is simply not at issue.

**B.      Defendants' Other Standing Arguments Do Not Justify Dismissal of Plaintiff's Prayer for Money Damages.**

**1.      Defendants Do Not Even Attempt to Show a Lack of Standing to Secure Money Damages After *Sprint* Based on the FHA and ELCRA.**

Albeit without devoting significant argument to *Sprint,* Defendants imply that this Court might sidestep its controlling rule because Plaintiff sues here under 42 U.S.C. § 1983. Namely, Defendants urge that § 1983 renders a wrongdoer liable "to the party injured," and this somehow implies *Sprint* might not apply. *See* Defs' Mot. for Part. J. 14.

An initial fatal problem with this line of reasoning is that Defendants limit their challenge to standing to obtain money damages under § 1983, ignoring Plaintiff's pleadings under the FHA and ELCRA. Whatever the wording of § 1983, it certainly says nothing about Plaintiff's standing under other operative statutes. Even if Defendants were correct (they are not), that would mean Plaintiff has standing under § 1983 to secure injunctive and declaratory relief and attorney fees and costs, while relying on the FHA or ELCRA for compensatory and punitive relief.

Moreover, Defendants' present § 1983 argument could not even debatably apply by analogy to the ELCRA or the FHA. For example, the ELCRA affords a damages remedy by forbidding religious discrimination and states that "[a] person alleging a violation of this act may bring a civil action for appropriate injunctive relief or damages, or both." The words that Defendants rely on to argue about 42 U.S.C. § 1983 (being liable "to the party injured") are not a

part of ELCRA. The same is true of the FHA. *See* 42 U.S.C.A. § 3613 (affording liability by providing "if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages"). Indeed, the Supreme Court in *Trafficante v. Metropolitan Life Insurance Co.* made clear that Congress intended for the FHA "to define standing as broadly as is permitted by Article III." 409 U.S. 205, 209 (1972).

In sum, Defendants do not even attempt to argue that there is a lack of standing under all of the statutes at issue for money damages. Since their argument is specific to the language of § 1983, whatever the merits of that position, it simply does not justify the relief requested, which is outright dismissal of any claims for money damages.

### 2. Defendants' Old, Superseded Case Law Cannot Alter *Sprint*; Plaintiff has Standing to Obtain Money Damages Under 42 U.S.C. § 1983.

The above explains why, even if correct, Defendants' arguments about § 1983 cannot justify dismissal of Plaintiff's damages claims. But the fact is that Defendants are wrong about assignment-based standing to collect damages under § 1983 as well.

To begin with the obvious, *Sprint* contains no exceptions for § 1983. Indeed, *no case anywhere* supports Defendants' position. Defendants are asking this Court to create new law. The problem is that they do so based on old, pre-*Sprint* cases, namely *Quarles* and *Carter*, cited at on pages 14-15 of their motion. Defendants do not even argue that these cases survive *Sprint*, leaving it to the Court to sort it out for them. As seen below, this Court's only path is to recognize that *Quarles* and *Carter* are ***not*** good law at this point.

The thrust of both *Quarles* and *Carter* is that § 1983 uniquely bars assignment. Naturally, the statute does no such thing on its face—it never mentions assignment. However, it does state that persons shall be liable for injuries "to the party injured." Per Defendants' reasoning based on these cases, *only* the party injured can recover under § 1983, because of these words.

12

A serious problem with this reasoning is that parties other than the original, immediate victim *can* and *do* regularly recover monetary relief under § 1983 in a variety of contexts—as controlling precedent has recognized. For example, § 1983 claims survive the death of the plaintiff, allowing the estate to recover through an appointed administrator. *See*, *e.g.*, *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 592-93 (6th Cir. 2006) (court-appointed representative brought claim on behalf of the estate of a deceased infant, and the Court discussed types of monetary damages available), *Bletz v. Gribble*, 641 F.3d 743, 747 (6th Cir. 2011) (wife brought § 1983 claim individually and as representative of her deceased husband's estate, and recovery of damages was not barred by qualified immunity). As another example, parents and next friends can recover damages for the one immediate party injured under § 1983. *See*, *e.g.*, *F.H. ex rel. Hall v. Memphis City Sch.*, 764 F.3d 638, 640 (6th Cir. 2014) (minor child represented by his next friend and mother brought a § 1983 claim against city school district and employees seeking compensatory damages). Such damages can also be afforded through class representatives under § 1983. *See Lee v. City of Columbus, Ohio*, 636 F.3d 245, 247 (6th Cir. 2011) (class action under § 1983 claiming, among other relief, compensatory damages). It is simply not the case that only the one immediate party injured may recover damages under § 1983; in none of the above instances is § 1983 treated differently than any other statute.

Another problem with *Quarles* and *Carter* is that the Supreme Court itself has endorsed assignment of § 1983 damages. In *Venegas v. Mitchell,* 495 U.S. 82 (1990), the Court addressed the issue of whether statutory attorney fees under § 1983 limited the compensation attorneys could receive from civil rights plaintiffs. The Court held that, while a § 1983 claim belongs "to the injured individual," in some circumstances an individual has the freedom to waive his or her § 1983 claim, therefore "[i]f § 1983 plaintiffs may waive their causes of action entirely, there is little

reason to believe that they may not assign part of their recovery to an attorney if they believe that the contingency arrangement will increase their likelihood of recovery." *Id.* at 88. In other words, assignment of the right to recover damages on claims brought under § 1983 is ***not*** in tension with the statutory wording.

Putting aside these many ways *Quarles* and *Carter* have been shown to be incorrect, perhaps the most important point is that they simply cannot be reconciled with *Sprint.* To see why, one must understand the statute that was at issue there. Just as § 1983 makes a certain class of wrongdoer liable "to the person injured," the statute involved in *Sprint* stated:

> In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable ***to the person or persons injured*** thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

47 U.S.C.A. § 206 (emphasis added). The bold language did not prevent the assignments in that case; per the Supreme Court, the assignments were permissible and afforded standing. *Sprint* could not have been decided as it was if Defendants are correct and such bold language thwarts assignment that transfers standing. This Court simply cannot rule as Defendants urge, after careful review of the substance of *Sprint.*

### 3. There is no Timing Issue Here; Plaintiff's Operative Complaint is the Amended Complaint.

Defendants briefly argue on pages 13-14 of their motion that Plaintiff could not achieve standing by assignment after filing the complaint. Standing is typically determined at the outset of litigation, but as the Supreme Court noted in *Warth*, "it is within the trial court's power to allow . . . the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized

allegations of fact deemed supportive of plaintiff's standing." 422 U.S. at 501.

Moreover, the law does not require futile acts. *McCord v. Bd. of Educ. of Fleming Cty., Kentucky*, No. 17-5548, 2018 WL 1724560, at *7 (6th Cir. Jan. 30, 2018) (Ex. A) (stating that amendments to a complaint should be given "freely" unless such amendment would be futile and vacating denial of leave to amend where the amendment "might not be futile"); *Kile v. Int'l Truck & Engine Corp.*, 399 F. Supp. 2d 829, 834 (M.D. Tenn. 2005) (quoting the "maxim that the law 'will not indulge in idle formalities, or do vain or futile acts.'"). Here, dismissals for lack of standing are granted without prejudice. *B. & V. Distrib. Co. v. Dotorre Cos., LLC*, 278 F. App'x 480, 487 (6th Cir. 2008). That means if the Court were to dismiss this case for lack of standing, Plaintiff would file a new case, post-assignment.

Futility is just one reason that courts have repeatedly held that assignment post-filing does afford standing. Another reason is that the alternative would elevate form over substance:

> A rule that would turn on the label attached to a pleading is difficult for us to accept. As the Eleventh Circuit has observed in a case in which an amended complaint contained jurisdictional allegations that were based on post-complaint events, "[e]xcept for the technical distinction between filing a new complaint and filing an amended complaint, the case would have been properly filed . . . . We therefore hold that we have jurisdiction over this appeal and we will reach the merits." *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir.1990).

*Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1047 (9th Cir. 2015) (*as amended on denial of reh'g and reh'g en banc*).

This refusal to elevate form over substance finds a procedural home in Federal Rule 15. It both allows for amendment in 15(a) and permits such pleadings be considered to correct initial pleading deficiencies in 15(d). The very purpose of this is to circumvent "the needless formality and expense of instituting a new action when events occurring after the original filing indicated a right to relief." Wright, Miller, & Kane, *Federal Practice and Procedure: Civil* 3d § 1505, pp.

262–63. Even though Rule 15(d) "is phrased in terms of correcting a deficient statement of 'claim' or a 'defense,'" the rule allows for correction of "any other defect for purposes of defining the proper scope of supplemental pleading." *Id.* at § 1507, p. 273.

The Supreme Court has endorsed the use of this Rule to avoid needless dismissal-then-refiling in *Mathews v. Diaz,* 426 U.S. 67 (1976). In that case, an applicant for Medicare had never filed an application until after an amended complaint was filed purporting to join him. This was a jurisdictional defect that the applicant could overcome:

> Although 42 U.S.C. § 405(g) establishes filing of an application as a nonwaivable condition of jurisdiction, Espinosa satisfied this condition while the case was pending in the District Court. A supplemental complaint in the District Court would have eliminated this jurisdictional issue; since the record discloses, both by affidavit and stipulation, that the jurisdictional condition was satisfied, it is not too late, even now, to supplement the complaint to allege this fact.

*Id.* at 75 (internal citations omitted).

*Mathews* has spawned a whole line of cases holding that after a court has allowed a voluntary amendment, as here, the amended document determines the case's viability—a form of relation back of the amendment. In short, the touchstones for determining jurisdiction become "the facts existing at the time the complaint *under consideration* was filed." *GAF Bldg. Materials Corp. v. Elk Corp.,* 90 F.3d 479, 483 (Fed. Cir. 1996) (emphasis added); *see also Rockwell Int'l Corp. v. United States,* 549 U.S. 457 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."); *Northstar*, 779 F.3d at 1044–45 ("[I]t is the Amended Complaint that is currently under consideration, and it is the facts alleged in this complaint that form the basis for our review" of standing).

This rule has been used specifically in cases like this one, where an assignment occurs post-filing: the post-filing assignment affords standing, with amendment of the complaint interpreted

as a corrective supplemental pleading under Federal Rule 15(d). *See Northstar*, 779 F.3d at 1044–45 (providing a long explanation for permitting the cure to relate back); *Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 412 (E.D. Va. 2011) ("It would be wasteful and inefficient to require TIAG to go through the formality and expense of instituting a new action solely because the assignment agreement was executed after the filing of the original Complaint"); *Bushnell, Inc. v. Brunton Co.*, 659 F.Supp.2d 1150, 1159–60 (D. Kan. 2009) (granting motion to amend in patent infringement suit where plaintiff lacked ownership in patent, and hence standing, as of the date of the original complaint, but was subsequently assigned all right, title and interest in patent); *Silicon Graphics, Inc. v. ATI Techs., Inc.*, No. 06-C-611-C, 2007 WL 5595952, at *10 (W.D. Wis. June 14, 2007) (Ex. A) (holding that after-filing assignment affords standing and drawing comparison to amendments that allow addition of a party with standing to cure deficiency); *Randolph–Rand Corp. of N.Y. v. Shafmaster Co., Inc.,* No. CIV. 97–44, 1999 WL 814367, at *2 (D. N.H. Apr. 8, 1999) (Ex. A) (denying motion for partial summary judgment, which asserted that plaintiff in patent infringement suit lacked standing when the original complaint was filed, where plaintiff had standing as of the date of the amended complaint); *Bowers v. Estate of Mounger*, 542 S.W.3d 470 (Tenn. Ct. App. 2017) (finding standing cured by post-filing assignment).

## II.    Defendants Are State Actors

Part II of Defendants' brief seeks the complete dismissal of Counts I and II on the ground that "[t]here is simply no state action attributable to Bay View." Defs' Mot. for Part. J. 21. Defendants' two arguments in this section both fail. First, Defendants urge that Bay View is not a municipal or governmental entity because the 1929 Summer Resort Owners Act devolves more power to entities created under it than the 1889 Act gave to Bay View. This argument is a red

herring and fails because, as shown below, it conflates what is *sufficient* with what is *necessary* to show state action. Second, Defendants argue that there is not a sufficient nexus between the powers Bay View exercises and its alleged wrongful actions. This argument assumes that Bay View is a purely private entity—an argument that is belied by all the facts alleged and admitted thus far.

A. **The Powers Delegated to Bay View Under the 1889 Act are Sufficient to Establish it as a Municipal Entity Notwithstanding the Existence of Other Acts that Grant More Powers.**

On pages 15-16 of their motion, Defendants imply that Plaintiff is confused or misleading about what Bay View is, and they urge this Court to distinguish the Summer Resort & Assembly Association Act of 1889 from other Acts, especially the Summer Resort Owners' Association Act of 1929. This is much ado about nothing, as everyone agrees that Bay View came into being under the 1889 Act.

Defendants argue that because the Summer Resort Owners Association Act grants more power to associations formed under it than those granted under the 1889 Act, it follows that entities created by the earlier Act are not state actors. This does not follow. There may be no question that the 1929 Act's delegation is *sufficient* to create state action. That does not mean, however, that a delegation of "*all*" the general powers of government is *necessary* to create a municipal actor. Certainly Defendants cite no case requiring that "*all the general powers*" of government be invested in an entity in order to create state action. Nor could they. If that were the test, then the Supreme Court's *public function* test (asking whether an entity "has been delegated **_a_** public function" is sufficient to subject it to federal law) would not exist at all, *i.e.*, if only entities with *all* state powers could be considered state actors. Plaintiff has shown that this Bay View was created as a political entity, and Defendants have not and cannot cite any case anywhere holding such entities, when acting through official channels, are **_not_** acting under color of law.

**B.** **Bay View Is Not A Purely Private Entity, But Even If It Were, There Is A Sufficient Nexus Between Its Power To "Manage And Control . . . All Property" In Bay View And Its Discriminatory Religious Test for Property Ownership.**

Defendants next argue at length about the nexus between a challenged act and the State's delegation of powers to a private entity. Defs' Mot. for Part. J. 18-19. In this regard, the Court should carefully distinguish between two key legal points. One is that Bay View is a public entity; its enabling/enacting legislation and the numerous police powers it enjoys all speak to that issue. The separate question about when an entity is sufficiently government-like to apply the constitution is only reached if Bay View is private. Defendants do not carefully distinguish these separate questions. Bay View is not a private entity delegated a single function. It is a political, public entity; thus, to discern its liability, one looks to *Monnell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

Regarding whether Bay View is a public entity: the Amended Complaint contains numerous allegations, many of which Defendants' have admitted, establishing Bay View as public. Bay View is "an entity invested with powers and duties of government," Am. Compl. ¶ 3, and "as sovereign, [the State] delegates to summer resort associations organized under the 1889 Act, including Bay View, substantial government powers." *Id*. at ¶ 26. Bay View's state powers constitute "substantial authority which is governmental in character and which clearly may affect the rights of the public." *Id*. at ¶ 38 (citing Op. Att'y Gen. 1997 No. 6942). Moreover, the State has devolved to Bay View's board "the management and control of the business, finances, rights, interests, buildings and all property, real and personal, of the association." *Id*. at ¶ 29.

The Amended Complaint contains many other examples, including various police and health and welfare powers, that the State has delegated to Bay View. *Id*. at ¶¶ 28-40. And it alleges that, based on the State's delegation, Bay View "may make, amend, and enforce the laws or

regulations enacted by the community. *See*, *e.g.*, MCL § 455.59; Am. Comp. at ¶ 35. Later, the Amended Complaint summarizes that "Bay View acts and operates under color of state law, namely pursuant to a delegation of state police powers, including arrest powers, the power to levy taxes and other powers detailed above. Moreover, judicial enforcement of restrictive covenants constitutes state action, per well established, controlling precedent of the U.S. Supreme Court." *Id.* at ¶¶ 102-03.

To grant Defendants' motion, this Court must find that these pleadings allow for no fact development, since there is no plausible opportunity for recovery, taking the above allegations in the light most favorable to Plaintiff. Plaintiff urges not only that the pleadings allow for such fact development, but on their face reflect that Bay View is a public entity.

In their motion, Defendants debate whether they can "appoint a Marshall [*sic*]." Defs' Mot. for Part. J. 20.[4] Defendants imply that this specific endowment—the power to hire a person who can act as a sheriff's deputy—is the touchstone for state action here. This then allows them to argue this is one delegation that is too far afield of the religious test to have a nexus to state action. Yet what the power to appoint a marshal tells the Court, *in context with all the other cited powers in the Amended Complaint*, (see ¶¶ 25-40) is that Bay View is a public entity akin to a municipality.

To the extent Bay View is arguing that it is a *private entity,* it must grapple first with *Marsh v. Alabama*, 326 U.S. 501 (1946). Plaintiffs' pending cross motion for summary judgment cites the delegations of power and the facts that certainly entitle Plaintiff to discovery, if not outright

---

[4] The correct word is "marshal," but to be fair, Plaintiff made an error too. As Defendants state, Plaintiff's Amended Complaint mis-cited the sub-provision of law concerning Bay View's power to hire a marshal. The Amended Complaint lists this as MCL 455.215, when in fact MCL 455.61 and 455.62 authorize Bay View and other entities incorporated under the Summer Resort & Assembly Association Act of 1889 to hire a marshal and take people to jail. With the spelling and citations all corrected, the net result is that Bay View is endowed with the police powers Plaintiff has always alleged (and properly cited in its cross motion).

judgment in its favor under this precedent. *See* Pl's Mot. for J. 8-9, ECF No. 38. To be sure, *Marsh* did not require *any delegation of government power or nexus* that Defendants emphasize in their brief. That ruling simply concluded that when an entity is enough like a municipality, it must follow the First Amendment. This holding is directly controlling as to all such municipality-like entities, and Bay View is one such entity.

It is only if the Court finds Bay View is not a body politic, as State law defines it, and is not sufficiently similar to the town in *Marsh,* that it must assess the connection between the State's explicit delegation of authority and Bay View's alleged constitutional violation. In short, the meat of Defendants' argument is afield of some of the most obvious legal bases for finding state action here. Nevertheless, if this Court reaches this issue, it should recognize that the State of Michigan entrusted Bay View to "manage and control . . . the business, finances, rights, interests, buildings and all property, real and personal, of the corporation . . ." MCL § 455.58. Defendants admittedly use this power to limit as a class who can own or inherit real property in the town, which is clearly not a private function. Defendants' briefing offers the Court no explanation for why this explicit delegation and use of a delegated power is insufficient to amount to state action. Rather, the briefing only sets up the straw man that there must be a nexus that is "enough." Citations bolded liberally throughout Defendants' motion at pages 18-19 are generic quotes about the general need for a nexus, but do nothing to tell this Court how to decide this case. There is no precedent anywhere suggesting that a state-created local government excluding individuals from ownership of homes by exercising state-delegated powers to "manage and control . . . property, real and personal" is insufficient to plead state action.

### III.    Claim Preclusion Does Not Bar Count 5.

While Defendants correctly state the test for claim preclusion on page 22 of their motion, their application of the test to these facts is in error. The prior suit Defendants cite, *Agria*, was

admittedly decided on the merits. However, neither the parties nor the issues were the same as those involved here, so the requirements of claim preclusion are not satisfied.

First, regarding the parties, Defendants concede that this Plaintiff is not the same as the plaintiffs in *Agria*. Defs' Mot. for Part. J. 23 ("The question then is whether there is a sufficient identity of parties to allow application of the doctrine."). Rather, Defendants argue that this Plaintiff and the named individual plaintiffs of *Agria* are in privity. Without further explanation, Defendants quote liberally from *Adair v. State* and then perfunctorily conclude that "plaintiffs in the previous litigation had the same interests as the plaintiff in this case" and that those "interests were presented and protected" in the prior case. *Id*. at 23.

That is an ironic stance, since Defendants' brief in its first half argues that the claims and interests of each of the individual members of the present Plaintiff are widely divergent, discrete and unique. Defendants' standing argument urges, for example, that each human member of Plaintiff has varying damages that "require individualized proof . . . Even two individual members of the Group who fall into the same category will have different claims for damages . . . Those claims are not common to every member," and so on. *See*, *e.g.*, *id*. at 12.

Plaintiff's response concerning standing (above) does not dispute that the claims it holds by assignment may require individualized proofs. Rather, Plaintiff has shown that this factor is irrelevant for standing, because it owns its claims outright. In short, Defendants' arguments about divergent individualized proofs are not necessarily wrong, they just are not controlling as to standing. However, Defendants' claims about divergent claims and interests *do* undermine the alleged privity it relies on to seek claim preclusion. By arguing that the interests of each individual homeowner differ, Defendants concisely establish why privity must not apply here. Privity requires substantial identity of interests. *Adair v. State*, 680 N.W. 2d 386, 396 (Mich. 2004).

Specifically, this may be understood as "mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." *Sloan v. City of Madison Heights*, 389 N.W. 2d 418, 422 (Mich. 1986).

Even if the homeowner litigants of *Agria* overlapped in interest with those who are part of Plaintiff (they do not, as explained below), this Plaintiff also stands in the shoes of non-members, while the *Agria* suit included *solely* members of Bay View. The *Agria* suit explicitly recited that the inability of members to govern themselves by a majority was harming the value of their homes. Meanwhile, this Plaintiff seeks damages for *would-be buyers* who cannot purchase a home due to provisions of Defendants' bylaws, which are at odds with state law cited in Count V. Those would-be buyers were not part of *Agria* and *could not have been*; as non-members they had no right to assert their interests relative to an internal dispute over the outcome of a 52% member vote. Nor are their damages akin to those of the homeowners. Defendants bear the burden of establishing why res judicata should apply, *see*, *e.g.*, *Sloan*, 389 N.W. 2d at 422, yet they do not even attempt to argue that the interests of the would-be buyers are similar to those of the current owners. This is fatal. *Id.* (holding that the failure of the party asserting res judicata to establish privity precluded application of the doctrine without further analysis).

The second fatal flaw in Defendants' res judicata claim is that *Agria* did not decide the questions at issue here, nor are the claims here of the type that had to be asserted in the prior action. The specific issue litigated in the prior suit is whether "By-law Section 77-B of the Bay View Association of the United Methodist Church is inconsistent with MCL 455.59, and therefore void and unenforceable." Agria Compl. 7, ECF No. 37-1. The thrust of the suit was that Section 77-B requires a two-thirds vote of the membership to alter Bay View policies and practices, while MCL 455.59 provides that bylaws "may be amended or rescinded by a majority vote at any annual

meeting of the association." *Id.* at 5 (quoting MCL 455.59). The basic operative fact in *Agria* was a recent 52% vote of members to alter a bylaw. Agria Op. 1, ECF No. 37-2 ("While a majority of approximately 52% voted in favor of [a] proposed [bylaw] amendment, it was determined to have been defeated due to the supermajority voting provision in Paragraph 77-B of the By-Laws . . . "). Was 52% actually enough, or did Section 77-B stand, requiring more than two-thirds vote? In ruling on the merits, the Circuit Court settled the specific question of whether MCL 455.59 voided Section 77-B of Bay View's bylaws. The Circuit Court held that 77-B was not a bylaw subject to the majority vote provision of MCL 455.59 because that bylaw was created by *the membership* of Bay View rather than the Board of Bay View. *Id.* at 4. That is, MCL 455.59 applies only to bylaws created by boards, not by members. *Id.*

The present suit does not ask these questions and nowhere urges this Court to revisit the Circuit Court's ruling. This distinction is pivotal, since the test for claim preclusion in Michigan is whether *the same facts or evidence are essential to the maintenance of the two actions*, not a comparison of the grounds for relief. *Jones v. State Farm Mutual Automobile Insur. Co.,* 509 N.W.2d 829, 834 (Mich. Ct. App. 1994).[5]

Here, there simply is little if any overlap of operative facts with *Agria*. Whether a 52% vote

---

[5] The case law in this area is not a paragon of clarity, but the Michigan Supreme Court and appellate courts have repeatedly held that "[r]es judicata bars a subsequent action between the same parties when the evidence or essential facts are identical." *E.g., Stanton v. Auto Owners Ins. Co.*, 2016 WL 6269614, at *4 (Mich. Ct. App. Oct. 25, 2016) (Ex. A). In other words, the type of claims the *Agria* plaintiffs had to assert together, or else lose, were those that had "identical" facts as those now at issue. Certain opinions refer to a transactional (rather than evidentiary or factual) identity between the first and second cases, but even these courts recognize that two cases impermissibly consider "a single cause of action if **a single group of operative facts** give rise to the assertion of relief." *E.g., Garrett v. Washington*, 886 N.W.2d 762, 766 (Mich. App. Ct. 2016). In short, whether the facts between Case One and Case Two must be "identical" or turn on "a single group of operative facts" appears semantic. In either formulation, Defendants cannot show that the issues were the same and so must have been brought together.

is or is not sufficient to alter different types of bylaws has absolutely nothing to do with whether, as Count V of the current complaint alleges, Bay View's religious litmus test violates the Michigan Constitution. Nor does the sole operative fact of *Agria* speak to another of Count V's claims, namely that *the religious test*—not the two-thirds voting provision—conflicts with Bay View's Articles of Association or MCL 450.2488 and is void as a result. Defendants' attempt to expand the holding of *Agria* and assert that the rest of the provisions in Bay View's bylaws and its practices are forever insulated from judicial review—including review demanded in Count V for alleged violation of the State Constitution—cannot pass muster.

## RELIEF REQUESTED

Plaintiff urges the Court to DENY Defendants' renewed motion for partial judgment on the pleadings on the basis of the above analysis.

Respectfully submitted,
SALVATORE PRESCOTT
& PORTER, PLLC

/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
Dated: May 21, 2018                     prescott@spplawyers.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,
SALVATORE PRESCOTT
& PORTER, PLLC

/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
Dated: May 21, 2018                    prescott@spplawyers.com