# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN

**BAY VIEW CHAUTAUQUA INCLUSIVENESS GROUP,**

    Plaintiff,

vs.

**THE BAY VIEW ASSOCIATION OF THE UNITED METHODIST CHURCH**, et al.,

    Defendants.

CASE NO. 17-cv-0622-PLM-RSK

HON. Paul L. Maloney

**Plaintiff's Reply Brief in Support of Corrected Motion for Judgment on the Pleadings**

**ORAL ARGUMENT REQUESTED**

---

Sarah S. Prescott (P70510)
SALVATORE PRESCOTT & PORTER, PLLC
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplawyers.com

Michael S. Bogren (P34835)
PLUNKETT COONEY
Attorneys for Defendants
950 Trade Centre Way, Suite 310
Portage, MI 49002-0493
(269) 226-8822
mbogren@plunkettcooney.com

---

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PLAINTIFF'S CORRECTED MOTION FOR JUDGMENT ON THE PLEADINGS

Now comes Plaintiff, Bay View Chautauqua Inclusiveness Group, by and through its attorneys of record, Salvatore Prescott & Porter, PLLC, and for its Reply Brief in Support of its Corrected Motion for Judgment on the Pleadings, hereby states as follows:

### I. Bay View Defendants Violate Plaintiff's Rights Under Color of Law

Defendants do not dispute that a governmental unit must not engage in the religious discrimination seen here. Instead, they argue that they are not liable under 42 U.S.C. § 1983 because the words "body politic and corporate" do not necessarily mean Bay View acts under color of law, Resp., PageID.859-860, and because they assert a 1929 Act delegates more state authority

to particular entities than the 1889 Act at issue delegates to Bay View—again meaning that they are not a state actor. *Id.* at PageID.861-862.

If the Bay View Defendants are a municipality or "other local government unit," *Monell* teaches that they are liable under § 1983 for their official policies and practices, as Plaintiff fully cites in its motion at PageID.570. When local government units make policy, in other words, they act under color of law. Bay View is such a public body or local government because it is so defined under State law (i.e., as a body politic and corporate, the most exact expression used for such bodies, the same one used for counties and townships) **and** because of the delegation of traditional State powers—including taxing authority, general police powers ("police powers" here refers to powers of controlling general welfare, security, and morality), running elections, creating penal offenses etc. These delegated functions distinguish Bay View from the loyal order of the Elks and the other entities Defendants hold up as supposed comparators at Resp., PageID.859-860.

To date, Defendants have been utterly unable to identify precedent establishing that an entity so designated and empowered is *not* sufficiently "public" to be treated as a government unit. An entity acts under "color" of law if there is the "'appearance, semblance, or simulacrum,' but not necessarily the reality" of public action. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 211 (1970). Thus, *Monell* is controlling if Bay View *is* public or *resembles* a local government instrumentality.

When the Michigan Supreme Court interpreted a 1929 Act similar to the 1889 Act at issue here, the question whether a summer resort acted under color of law and was thus bound to the Constitution was resolved based on the finding that the entity in question "possesses many quasi-governmental characteristics." *Baldwin v. North Shore Estates Ass'n*, 384 Mich. 42 (1970). In other words, the Constitution applied to a summer homeowner's association since the entity had "many

2

quasi-governmental characteristics." Plaintiff's motion likewise cites "many quasi-governmental characteristics" Bay View enjoys, and these should be controlling here.

However, Defendants urge that *Baldwin* is irrelevant because the 1929 Act delegated more State authority than the 1889 Act that created Bay View delegates to these Defendants. The statutes speak for themselves, and Plaintiff does not agree. But even if Defendants were correct, the delegations that the *Baldwin* court found pertinent were the powers to "manage, grade and maintain the access road running through the five subdivisions….to provide for police patrol and snow removal, and for other common purposes including the employment of a corporation attorney." *Id.* at 44. Those same duties were delegated to Bay View in the 1889 Act, and many more, again as cited in Plaintiff's motion.

Defendants argue that these powers may not matter if they do not use all of them. Resp., PageID.862-863. The one power Defendants say they have not used recently is the power to name a marshal, and Plaintiff will assume that is accurate for purposes of this 12(c) motion. This fact happens to be legally irrelevant, however. It is not the **use** of state power that matters, but the endowment and option to use State power that controls. *See Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982).

If Plaintiff were wrong, and Bay View were completely private, Defendants would still be bound by the First Amendment under *Marsh v. Alabama*. Defendants do not claim *Marsh* is bad law, and they do not distinguish it meaningfully. At most, they assert it cannot control because the First Amendment violation seen there was limiting speech, while here it is establishing a religion. Resp., PageID.865. That is a distinction without a difference where the question at issue is what circumstances cause a private entity to be subject to the Constitution in the first place. The facts in *Marsh* admittedly apply here as cited in the motion, and that means the First Amendment applies.

3

Defendants certainly have shown this Court no way to deny Plaintiff's motion and at the same time to adhere to *Marsh*'s controlling conclusions about when the First Amendment binds a purportedly "private" town or city.

Instead, Defendants attempt to collapse *Marsh* with the so-called state action nexus test or public function analysis. However, *Marsh* stands on its own; it is good law; and it is controlling without reference to the public/private nexus Defendants claim must be found here. After all, *Marsh* involved *no* delegation of State power *whatsoever* to the corporate defendant, let alone a delegated function exclusively entrusted to the State. In fact, the function in dispute in that case—regulating access to and use of a private company's premises—clearly is *not* a function exclusively reserved to any State. Nevertheless, the *Marsh* defendant was bound to follow the First Amendment.

The upshot is that *either* being a quasi-municipality, as in *Marsh* **or** misusing a State-delegated public function suffices to hold a private entity to the First Amendment. Defendants wrongly urge liability can attach only if the Court finds **_both_** of these conditions obtain. The Court can confirm this view is wrong by reviewing *Marsh* and searching for the part where the Court asks—"*what was the exclusive state function officially delegated and how closely was the delegation connected to the named defendant's wrongful act?*" Those concepts will not be found in *Marsh* whatsoever, because delegation and nexus are not the touchstones for liability.

Turning to the pure public function test, which would apply here even if both of the above analyses were rejected, Defendants continue to urge that a close connection between the constitutional tort and the State must exist. Nevertheless, Defendants give the Court no way of assessing that closeness. In that analysis, it must be remembered that "color of law" applies to "both actions actually authorized by a State….and misuse of state authority in ways not intended by

4

the State." *Adickes v. S. H. Kress & Co.,* 398 U.S. at 211 (Brennan, J., concurring in part). Here, it is undisputed that Bay View's authority to exclude religious minorities derives from a State statute affording the right to control the land. This being true, Bay View sets up the straw man that the delegation to run Bay View did not *also* explicitly call for religious discrimination. That might be controlling if *only* actions actually authorized by the State could be considered to be carried out under color of law. But as noted above, *misuse* of government power is also pertinent. That is why the statute only requires action under *color of* law, not always action under law.

Faced with this reality, Defendants urge that the delegation of power here is not an *exclusive* state function that "counts" in determining "color of law." That argument did not control in *Baldwin* where the defendant was holding a local vote, according to a resolution created by its membership. If abstraction to the level Defendants suggest passed muster, the *Baldwin* court would have isolated "enforcing a resolution" as the action at issue, rather than running a vote. However, in reality the action at issue was conducting a vote, and doing so is government function.

Holding a vote is a useful example of an action that is clearly a public function, *Nixon v. Condon*, 286 U.S. 73 (1932); *Terry v. Adams*, 345 U.S. 461 (1953), even though holding votes is clearly not "exclusively" a thing the government does. This example shows that Defendants overreach in arguing here that public functions are those "exclusively" entrusted to the State. Taken literally, the fact that any private person ever holds a vote would mean that all votes are therefore non-public functions. That is not the law. *Id.* Another example is running a park: Plenty of parks are privately operated, but operation of some parks is still a public function. *Evans v. Newton*, 382 U.S. 296 (1966). Running a golf course may be public, as in *New Orleans City Park Improvement Assn. v. Detiege*, 358 U.S. 54 (1958), even though many golf courses are privately operated. Schools are another example: Plenty are religious and/or private, but public schools are state actors.

5

In short, the Court cannot decide whether a function is a public function as Defendants urge—i.e., by determining if any private entity has ever engaged in some similar activity. The issue is whether the action in question is traditionally and generally conducted by the State. Here, that answer is simple: "The zoning function is traditionally a governmental task." *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 121 (1982).

For the above three reasons, Defendants' enforcement of a religious test occurs "under color of law" as a matter of law.

## II.   Defendants Violate State and Federal Housing Laws on the Uncontested Facts

The parties agree on the text of the FHA and the exemption Bay View claims applies here. Defendants also "acknowledge Title VIII applies" to them. Resp., PageID.871. The parties further agree that it is Bay View's burden here to establish that any exemption plausibly applies. *Id.* at PageID.869-870.

What is now unclear is whether Bay View continues to claim to fit the religious exemptions to either ELCRA or the FHA. On the one hand, Bay View again admits that it does "not 'own or operate' the 'dwellings'" at issue. Resp., PageID.870; *see also* Answer to Am. Compl. However, in a series of self-contradictory statements at Resp., PageID.869-871, Bay View seems to argue that the exemption *does* apply, because it must—otherwise, the FHA itself cannot reach Bay View. To cut through the rhetoric, both parties agree that (1) the religious exemption does not apply, unless Defendants own or operate the cottages at issue; and (2) Defendants do not own or operate the cottages at issue. This puts to rest the application of the exemptions under both FHA and ELCRA.

Defendants alternatively seem to argue that the FHA cannot apply here, because they do not own the structures in Bay View (they only own the land and lease it to the owners of the homes). Defendants are wrong about the reach of the housing Acts for several reasons. First, Bay View is

bound by its repeated judicial admissions that "Title VIII applies" to Bay View, including at Resp., PageID.871. Moreover, Defendants have simply made up the core contention here that only an owner/operator of a home may be liable under the FHA. There is no such law anywhere.

Most important of all, Bay View's theory directly contradicts the text of ELCRA and the FHA. Both Acts make it illegal for anyone to directly refuse to sell a property, *or* to "otherwise make unavailable or deny" a housing transaction, because of religion. *See* MCL § 37.2502(e) and definitions; 42 U.S.C. § 3604(a). This passive catchall is "results-oriented," referring "to the consequences of an action." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2511 (2015).

Hence, non-owners may be liable. Indeed, the FHA and ELCRA reach all sorts of non-owners whose actions indirectly prevent housing integration, including banks, realtors, state authorities and zoning boards, and insurers. *E.g., id.* (reaffirming the longstanding holding that the FHA applies to a non-owner "state entity" as it does to any other public or private entity); *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1354 (6th Cir. 1995) (holding that Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company could be liable under the FHA for discrimination in underwriting of homeowner policies); *City of Miami v. Citigroup Inc.*, 801 F.3d 1268, 1271 (11th Cir. 2015) (holding a bank could be liable for refusing to extend mortgage credit to minority borrowers on terms equal to non-minority borrowers).

While Defendants imply, without citation, that an owner can only be liable under the FHA *for directly refusing to sell*, and Bay View itself has not refused *to sell*, the fact is that "targeting unlawful zoning laws and other housing restrictions that unfairly exclude minorities from certain neighborhoods without sufficient justification are at the heartland" of permissible FHA claims. *Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2511. Indeed, under the catchall "otherwise

deny" language cited above, courts have struck down innumerable schemes of discrimination in housing that did not involve direct refusals to sell, recognizing the "comprehensive purpose of the Act." *United States v. City of Parma, Ohio*, 661 F.2d 562, 572 (6th Cir. 1981). *E.g., id.* (city ordinances requiring parking for residences and restricting height of buildings were unlawful because they would indirectly exclude minority buyers); *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir. 1977) (same, as to issuance of zoning permits); *Kennedy Park Homes Ass'n, Inc. v. City of Lackawanna,* 436 F.2d 108 (2d Cir. 1970) (holding it unlawful to rezone property selected for a low-income housing project and to deny sewer hook-ups to further discrimination).

In sum, parties that inject discriminatory obstacles of any sort into the housing sector can be liable under the FHA and ELCRA, whether they own the property at issue and irrespective of whether they directly thwart a sale or do so indirectly. Here, it is undisputed that Bay View interferes with sales to non-Christians by refusing to lease land to would-be non-Christian owners of the dwellings that sit on the land. This is actionable.

The FHA and ELCRA religious exclusions also cannot apply here, because Bay View does not limit sales to those of "the same religion" within the meaning of the FHA or ELCRA. Unable to find any law suggesting that Bay View's preference for those of a "Christian persuasion" fits the exemptions, Defendants create the straw man that Plaintiff is arguing "there is no Christian religion." *See* Resp., PageID.872-873. In fact, Plaintiff is arguing that Defendants have failed to show as a matter of law that there is **only one** Christian religion. Nor can Defendants meet this burden, as the Sixth Circuit recently recognized: "[T]he faiths of Christianity are diverse, not monolithic." *Bormuth v. Cty. of Jackson*, 870 F.3d 494, 513 (6th Cir. 2017) (naming various Christian religions, explaining their history and hinging a constitutional decision on differences

8

within the Christian faiths). The fact that Defendants found cases containing the word "Christian," does not establish as a matter of law that all Christians are "the same religion" within the meaning of State and Federal housing laws. Only such a holding would support application of the religious exemptions here.

On the issue of whether they engage in transactions within Bay View for purposes other than a commercial purpose, Defendants argue that they do not own the homes being sold or rented, and that any rental proceeds would accrue to the benefit of owners, not Bay View. That would be useful if it related to the exemption at issue. Yet nothing in the law looks to whom commercial profits benefit. To be exempt, Bay View must own or operate the cottages at issue for other than a commercial purpose. They do not—both because they do not own the cottages at all (as discussed above), and because whoever *does* own them will buy/sell or rent for commercial ends. Michigan's courts have recognized the non-charitable nature of this tony summer resort. Defendants attempt to twist the showing that must be made here at their Resp., PageID.872, by arguing that the pleadings and admitted facts fail to establish "the ***primary*** purpose [of transactions in Bay View] is to generate a profit." In fact, it is Defendants' burden to show that commerce has nothing to do with Bay View transactions to meet the exemption. Given the facts admitted, Defendants cannot do so.

Turning to *Terpening v. Gull Lake Assembly of Michigan Conference of Methodist Protestant Church*, 298 Mich. 510, 512 (1941) and the issue whether Bay View is a religious entity, Defendants simply restate the holding of the case to claim it does not apply here. It is true that this case is not about escheating assets to a church, if that is Defendants' point. But the analysis of *Terpening* is what matters here. Per Michigan courts, Michigan's 1889 Act creates entities that are ***not*** ecclesiastic or sufficiently affiliated with any church to be a next relative. That necessary predicate to the *Terpening* decision is good law and controls here.

9

Defendants' only responsive argument to this controlling law is to itemize bylaws that purportedly tie Bay View to the Methodist Church. First, this elides the reality that when Bay View tried to memorialize such new changes with the State of Michigan, the State rejected the amendments. The State has made clear, in other words, that these efforts are not compatible with Bay View's form under State law. Furthermore, bylaws in no way establish Bay View is an arm of a church, when all sides admit the community has never had any affiliation agreement with any church. At best, the bylaws establish what Bay View wants, not what the Methodist church it purports to affiliate with has actually endorsed and agreed upon. Defendants ignore Plaintiff's case law establishing that an entity must at least have a two-way, active relationship with a religious body, to qualify under this exemption.

For the foregoing reasons, Plaintiff respectfully urges this Court to grant its Corrected for Judgment on the Pleadings.

Respectfully submitted,
SALVATORE PRESCOTT
& PORTER, PLLC

/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplawyers.com

Dated June 6, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated June 6, 2018

/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Salvatore Prescott & Porter, PLLC
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplawyers.com