UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

**BAY VIEW CHAUTAUQUA
INCLUSIVENESS GROUP,**                                   Case No. 17-cv-0622-PLM-RSK

      Plaintiff,

vs.                                                                                   HON. Paul L. Maloney

**THE BAY VIEW ASSOCIATION OF
THE UNITED METHODIST CHURCH**,
*a Michigan Summer Resort and Assembly Association,*
**THE BOARD OF THE BAY VIEW ASSOCIATION
OF THE UNITED METHODIST CHURCH**, *its
governing body, and* **BAY VIEW REAL ESTATE
MANAGEMENT, INC**., *a domestic profit corporation*,

      Defendants.

| | |
|---|---|
| Sarah S. Prescott (P70510)<br>SALVATORE PRESCOTT &<br>PORTER, PLLC<br>Attorneys for Plaintiff<br>105 East Main Street<br>Northville, MI 48167<br>(248) 679-8711<br>prescott@spplawyers.com | Michael S. Bogren (P34835)<br>PLUNKETT COONEY<br>Attorneys for Defendants<br>950 Trade Centre Way, Suite 310<br>Portage, MI 49002-0493<br>(269) 226-8822<br>mbogren@plunkettcooney.com<br><br>Jeffrey C. Gerish (P51338)<br>PLUNKETT COONEY<br>Attorneys for Defendants<br>38505 Woodward Ave., Suite 100<br>Bloomfield Hills, MI 48304-5096<br>(248) 901-4040<br>jgerish@plunkettcooney.com |

**<u>BRIEF ON IMPACT OF CHANGE TO BAY VIEW BYLAWS</u>**

i

**Introduction**

Plaintiff has pending a motion for judgment on the pleadings, filed under Federal Rule of Civil Procedure 12(c). *See* ECF No. 46, PageID.732-758.  The motion seeks partial judgment (as to liability) and a declaratory judgment and injunction based on a long, unabashed history of excluding non-Christians from a Michigan town.

Defendants are seeking dismissal of the damages remedy, based on a claim that Plaintiff lacks standing to recover damages under one of the statutes at issue here, 42 U.S.C. § 1983. Defendants also have cross-moved for dismissal of Plaintiff's § 1983 claim under Rule 12(c) on the theory that Plaintiff has failed to allege state action.

When Bay View raised that it might consider changing its bylaws during oral arguments on the above matters (after they had pended for months), this Court asked the parties to brief the impact of any bylaw change.

**Background Intransigence of Bay View & the Hail Mary Bylaw Amendment**

*Those who fail to learn from history are doomed to repeat it*,[1] and this reality makes some background useful for the Court's review of where the parties now sit.  Some of the parties in this matter have been seeking to eliminate religious discrimination within Bay View, Michigan for years and years. Over time, scores of efforts to do so, including petitions, bylaw amendment proposals, legal memos, appearances at Board meetings, and community meetings have failed.  In addition to letters, emails and live presentations at Board meetings too numerous to count and from a variety of Bay View homeowners, some of the key *failed* efforts have included:

- In 2010, alarmed by historical research that Bay View's membership policies

---

[1] This quote is often attributed to Winston Churchill, among others.

1

were originally racist and anti-Semitic, Bay View members discussed the matter with the President and other Trustees and requested that the Bay View board organize community conversations on Bay View's membership policies. The trustees refused and declined to do so. Discrimination continued.

- In 2011, a group proposed a bylaw amendment eliminating the religious test for membership, which failed. Discrimination continued.

- A special 12-person Committee on Membership met through the summer of 2012 to address the religious test; no resolution was reached. Discrimination continued.

- In 2013, 16 of Bay View's 18 clergy members supported amending the bylaws to remove the bylaw at issue. Discrimination continued.

- By August 2013, various members of Bay View submitted a bylaw amendment that would alter the Christian litmus test now at issue. The vote was 364 for the change, 338 against (about 52% for change). *See* ECF No. 37-2, PageID.555. The leadership of Bay View fought to ensure that the majority vote for change would not be enforced, and discrimination continued.

- In January 2014, a legal memo by three lawyers, who are also Bay View members, addressing the illegality of a religious test for cottage ownership was submitted to the entire Board. The Trustees took no action. Discrimination continued.

- By November 2016, several Bay View members filed complaints with the U.S. Department of Housing and Urban Development (HUD) arguing that the religious test was unlawful. A copy of the Memorandum of Facts and Law that provides the legal basis for this filing was provided to each member of the Bay View Board of

Trustees.  Discrimination continued. (The HUD investigation remains ongoing.)

Exh. A, Duquette Aff.

After 2013, Bay View also set about a series of changes within Bay View intended to draw the community into *closer* alignment with the United Methodist Church.  Facts, mostly admitted, related to this effort are part of the Complaint and Answer in this suit.  The Michigan Department of Licensing and Regulatory Affairs (LARA) rejected amendments to the Bay View Articles of Association that purported to place Bay View under the control of the United Methodist Church. In short, by the time this case was filed, Bay View was *further* from eliminating the Christian litmus test than ever before.  Exh. A, Duquette Aff.  **<u>Discrimination continued.</u>**

Despite all these failures to drill sense into Bay View's utterly intransigent leadership, before filing this suit, the undersigned made repeated new outreaches to urge compliance with housing laws.  Plaintiff circulated a draft of the complaint in this matter before filing and sought mediated resolution ("Our hope is that Bay View will acknowledge that its policies are illegal and cannot be maintained….We invite you and your counsel to meet with us to engage in pre-filing negotiations with the goal of resolving this issue.").  Exh. B.  That was not agreed upon. Discrimination continued.  On July 6, Bay View sent a letter deflecting, Exh. C. It demonstrated no interest in mediating, but simply asked who the individual Plaintiffs would be.  In response, the next day, Plaintiff responded and offered to stipulate to a delay in answering the suit so that the parties could mediate.  Exh. D.  No response was given from Bay View.  Discrimination continued.

Undeterred, at the time the suit was served, Plaintiff *again* indicated, "Since Bay View did not accept our invitation to discuss this matter before filing suit…I will extend our offer of

3

settlement in writing…" The offer to settle by eliminating religious discrimination was enclosed. Exh. E. Again, Bay View made no response. Discrimination continued.

In fact, leadership within Bay View now publicized the claim to the community that Plaintiff had never given Bay View a "good faith" chance to resolve the matter. Exh. F, Above Board Memo. Therefore, to attempt again a resolution, Plaintiff's counsel wrote:

> I read with interest your recent update to the Bay View community, which implies that if you would have had more time to resolve matters relating to the religious test for Bay View membership, you would have done so and that the only thing that stopped you from being able to do so was the short deadline and the supposed failure on my part to return outreach by you. Please forward the offer to resolve this matter without litigation (or any other item suggesting any interest in even discussing bylaw changes), which you feel that we have failed to respond to, and I would be more than happy to issue a public apology. There isn't one, to my knowledge.
>
> The good news is of course that you've suggested that nothing here needed to move to the extent of a federal lawsuit. We are glad to hear that's the case and only hope that it is true. We would be happy to extend the deadline for Bay View to respond to the complaint if it would like to negotiate a change in the bylaws, just as we offered in our initial contacts in June. That would ensure that Bay View incurred absolutely no legal fees in defending a federal lawsuit. You may or may not know that I reiterated this offer to Mr. Murray in writing on July 7, and received no response.
>
> I also *re*-reiterated this opportunity and our wish to settle this matter without legal expenses just days ago when I prepared the enclosure letter for service of the lawsuit. I have received no response to that attempt, either. The offer remains good, and I am heartened by the indication you have now publicly made that you were willing to entertain such talks, but for the difficulty of managing with Roberts Rules and such. I look forward to hearing your availability to enter those discussions. Would next Thursday or Friday suit you? If not, please suggest the day.

Exh. G. Bay View did not respond. Discrimination continued.

After this was in litigation, Bay View did attend a mediation which this Court had ordered. However, the mediation ended after only a few hours' time and was not successful. Discrimination continued.

4

Finally, in June 2018, both parties exchanged offers to resolve the case. The negotiations ended on June 29, with Bay View leadership broadcasting a communication to the entire community, stating that the negotiations were over; that Plaintiff was only interested in "the removal of Christianity from Bay View;"[2] and that the litigation "will move forward." Exh. H, Above Board Memo. Discrimination continued.

Meanwhile, members of the community had proposed once again to change the bylaws. The new proposed bylaw would eliminate the requirement that a home owner be "of Christian persuasion" and replace it as follows:

> ~~Is of Christian persuasion~~ Agrees to respect the principles of the United Methodist Church and preserve the history and values of the Chautauqua movement. Applicants support the Bay View Association Mission: To be an institution in which Christian values and traditions are central; To enrich the human experience for individuals and families within Bay View and the surrounding community through a seasonal program of religious, educational, cultural and recreational opportunities; to provide a Christian perspective in a changing world.

On July 17, days before oral argument, the Board declined to endorse this proposed amendment. Exh. A, Exh. I. Discrimination continued.

Oral arguments were held July 30, and the vote on the bylaw had been scheduled for August 4.

***Only after oral argument did the board members (several of whom attended oral arguments) apparently determine after years of stonewalling that embracing the bylaw was now the best chance of survival of some sort of religious test.*** Specifically, as reflected in Exh. J, these Trustees concluded that it might improve their odds of never facing a "jury trial" if the

---

[2] This claim is false and offensive to many of the Plaintiff's members, who are Christian. Plaintiff seeks compliance with the law, not eradication of religious beliefs or practices. Owners in Bay View are free to practice their religion and bar their doors to anyone they want – in their churches, homes and clubs. They are not permitted to violate State and Federal law as regards housing or the First Amendment.

5

bylaw passed. Therefore, on August 2, for the first time, the Bay View board *partially* flipped to communicate support of the amendment. The new bylaw passed with a slim 2% margin. Exh. A.

At any time, the Board could have recognized the blatant illegality of its religious test and declared it void and unenforceable – as are all rules and regulations, contracts and other dealings in violation of law. Instead, Bay View's board waited to the last moment to see how the winds were blowing, and only then *partially* endorsed the least-worst alternative to totally losing this case.

As seen below, the August 4 date did not mark the beginning of the end of this case. To crib from Churchill again, it was only the end of the beginning – for Bay View's next act was set up right away: discrimination under the new bylaw.

## Analysis

Overall, the impact of the bylaw change is to add to the work the parties and this Court must now do, but it has removed nothing from the table. Part I below explains the Court's ongoing duty to adjudicate the facts presented in the Amended Complaint. Part II below explains what will now need to be done, in addition, to address the new bylaw.

**I.     The Bylaws Change Does Not Remedy the Violations Outlined in the First Amended Complaint; this Court is Required to Resolve the Pending Motions**

    **A.     Plaintiff's Damages Case is Justiciable and Liability Should be Resolved Now**

A defendant cannot moot a case by presenting a moving target, renewing its unlawful conduct under a different guise, nor even by actual cessation of an unlawful practice. "[S]o long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case." *Ermold v. Davis*, 855 F.3d 715, 719–20 (6th Cir. 2017). Plaintiff has such a claim for damages. As explained below, this is not a situation in which any claim for injunctive or

6

declaratory relief is or could be mooted, but even where an equity case *is* mooted, "relief in the form of damages for a past constitutional violation is not affected." *Id.* (internal quote omitted) (same-sex couple's claim for damages still stands where marriage license was initially denied, even after state action rendered the need for injunctive relief moot); *see also Gottfried v. Med. Plan. Services, Inc.*, 280 F.3d 684, 691 (6th Cir. 2002) (allowing claim for damages to proceed); *Hood v. Keller*, 229 Fed. Appx. 393, 400–01 (6th Cir. 2007) (unpublished) (finding claim for injunctive and declaratory relief was mooted, but claim for compensatory damages and attorney's fees was not).

The only reason this Court could *not* address the 12(c) motion for redress would be if it found there was no standing on the damages claim. This Court entertained extensive oral argument around standing to recover damages, all of which focused on 42 U.S.C. § 1983 and the *Quarles* and *Carter* cases, two cases interpreting § 1983. Plaintiff strongly believes those cases cannot be viewed as good law after *Venegas v. Mitchell*, 495 U.S. 82 (1990) (holding § 1983 claims could be assigned) and *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008) (allowing standing based on assignment, involving a statute with the identical wording compared to § 1983). These points were aired in oral argument.

However, this case involves more than § 1983 claims. In *Trafficante v. Metropolitan Life Insurance Co.*, the Supreme Court made clear that Congress intended for the second federal statute at issue, the Fair Housing Act (FHA), "to define standing as broadly as is permitted by Article III." 409 U.S. 205, 209 (1972). In other words, this Court is obliged to afford standing to the limits of Article III under the FHA. *Sprint* held in a different context that assignment-standing falls within Article III's limits. But *Warth v. Seldon*, 422 U.S. 490, 501, 515-516 (1975), an actual FHA case, is even more clear on the exact issue presented. There, the Supreme

7

Court noted that an association did *not* have standing specifically because the directly harmed individuals *had not* assigned their claims to the association. This indicates that assignments are cognizable and afford standing under the FHA – since the Supreme Court is not in the habit of floating non-existent possibilities around standing.

Notably, Defendants have never even attempted to argue that *Quarles* or *Carter* address standing under the FHA for money damages. Likewise, they have *never* attempted to argue lack of standing under State law. Their sole argument on standing relates to the language of § 1983 and, at most, addresses standing under that statute.

In short, Plaintiff has a viable damages case here, at the very minimum, under the FHA and Elliott Larsen – which is not even disputed. Because a change of facts cannot negate damages claims under the controlling 6th Circuit authorities above, Plaintiff urges the Court to grant its 12(c) motion and issue a declaratory partial judgment (on liability) on the pleadings as to the nature of Bay View's practices until August 2018.

By way of explaining for the Court the procedural intentions of Plaintiff, Plaintiff is dedicated to adjudicating this matter until there is a judgment that becomes res judicata. Only such an outcome will be final (as compared to a last-minute bylaw change, which can be manipulated in practice and overturned), and finality is very important to Plaintiff based on mistrust between the parties and recent events discussed below. If the Court were to deny the 12(c) motion, that opens discovery and the parties will litigate the merits by developing a more detailed fact record. Plaintiff does not believe that is necessary, but it is available.

If the Court were inclined to grant Defendants' standing motion, it would not resolve the pending 12(c) motion, since Plaintiff requests to be allowed to amend the complaint and just name humans with damages claims (i.e., "correcting" whatever standing issue is identified). The

Amended Complaint sets forth what those claims consist of: claims for being excluded from Bay View, claims for having housing prices artificially depressed, and the like. If the Court wants dozens of parties plaintiff to bring these claims, instead of one, a conforming amendment naming names ends the standing fight and brings the damages question right back into place. Moreover, there is declaratory and injunctive relief to consider (discussed below).

      **B.**    **Plaintiff's Equity Case Stands, and Declaratory and Injunctive Relief is Justified**

There is no dispute at all that this Plaintiff is entitled to see the discrimination end, and has standing to seek such equitable relief. This means there is no reason this Court cannot declare the former Bay View bylaw unlawful and enjoin future discrimination at Bay View. The recent change in bylaws does not move this case forward (e.g., as a judgment on liability would do), and it does not prevent future acts of discrimination (as an injunction would do).

The only possible response from Bay View must be that there is nothing more for the Court to do, in order to see justice done here, since the new bylaw is lawful and it has no chance of discriminating in the future. This may take the form of arguing that another vote to return to the old wording is unlikely, and Bay View has voluntarily complied with the law.

Voluntarily complying with the law after a suit has been filed moots a case only in the rare instance where subsequent events make it absolutely clear that the allegedly wrongful behavior could not recur. What is more, the party asserting mootness bears the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473–74 (6th Cir. 2008) (internal citations omitted). Indeed, when a defendant voluntarily "ceases…allegedly illegal conduct, the case is not moot unless two conditions are met: (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have

9

completely and irrevocably eradicated the effects of the alleged violation." *Michigan Protec. & Advoc. Serv., Inc. v. Flint Community Schools*, 146 F. Supp. 3d 897, 904–05 (E.D. Mich. 2015), quoting *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979). Both conditions must be met in order for a plaintiff's claims for equitable relief to be mooted. *Id.* As the Sixth Circuit has pointed out, the burden a defendant must meet under this test is substantial:

> The reasoning behind this "heavy burden" is simple: courts want to "protect a party from an opponent who seeks to defeat judicial review by temporarily altering its behavior." *U.S. v. City of Detroit*, 401 F.3d 448, 451 n. 1 (6th Cir.2005) (citing *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n. 1 (2001)). Otherwise, "the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n. 10, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)).

*Youngstown Publg. Co. v. McKelvey*, 189 Fed. Appx. 402, 405 (6th Cir. 2006) (unpublished); *see also Evans v. Prisk*, 2018 WL 3745736, at *2 (W.D. Mich. 2018) (Exh. L), report and recommendation adopted sub nom; *Arelio Evans v. Thomas Prisk, et al.,* 2018 WL 3729533 (W.D. Mich. 2018) (Exh. L) (rejecting mootness argument).

Where a defendant attempts to *partially* alter its illegal course of conduct, and *only after* initiation of this lawsuit, it certainly cannot prevail:

> In this case, [defendant's] burden is increased by the fact that the voluntary cessation only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed. Although the Attorney General has shown some willingness here to limit the scope of the Act, ***because he only did so once this lawsuit was filed, and even then did not correctly assess or define the constitutionally protected abortion methods, the state has not met the "heavy burden" of showing that it will not prosecute constitutionally protected abortions under the Act, and we therefore reject the state's mootness argument***.

*Northland Fam. Plan. Clinic, Inc. v. Cox*, 487 F.3d 323, 342–43 (6th Cir. 2007) (internal cites omitted) (emphasis added). *See also Case v. Jones-Kelly*, 2010 WL 99086, at *5 (S.D. Ohio

2010) (Exh. L) (noting that "there has been no evidence…that Defendants have done anything to solve what appears to be a systemic problem. ***Merely taking prompt action in response to a federal complaint…does not convince this Court that this behavior will not be repeated.*** As a result, Defendants' voluntary cessation of the behavior complained about here does not moot Plaintiffs' claims") (internal citation omitted) (emphasis added).

Defendants cannot meet the heavy burden of demonstrating that their illegal conduct of discriminating against non-Christians in homeownership is certain not to recur.  In fact, Defendants have not and cannot show the new bylaw is even in compliance with the FHA and Elliott-Larsen in the first place (i.e., that it even reflects a "voluntary cessation" of unlawful action at all).  To do so, it would need to show neither disparate treatment, nor disparate impact of the new bylaw.  Yet on its face, the new bylaw continues the imposition of a strict religious test as a condition of home ownership.  Applicants must "respect" the principles of a named church.  The word "respect" has several meanings.  "Respect" means "to admire deeply" or "have due regard to traditions of".  However "respect" also means "recognize and agree to abide by" with synonyms – "abide by, comply with, follow, adhere to, conform to, act in accordance with, defer to, obey, observe, keep, keep to".  The broad and vague language of the amendment certainly permits religious discrimination in Bay View, since it can be read as the reader wishes to read it.  *Cf. Landon v. City of Flint*, 2017 WL 2798414, at *5 (E.D. Mich. 2017) (Exh. L) (internal citations omitted) (holding that plaintiff's claims were not moot because the city could reoffend given the open-ended nature of an amendment to its Rental Inspection Code, which, as written, could allow for violations of the 4th amendment). The language in Bay View's Articles of Association and bylaws (both before and after the recent amendments) likewise is open-ended and lacks adequate specificity to ensure that discrimination will not occur.  Indeed, the new

language actually heightens the discrimination by limiting the accepted scope of religious beliefs to the principles endorsed by the United Methodist Church. (See principles of the United Methodist Church at http://www.umc.org/what-we-believe/preamble. Also, *Social Principles of The United Methodist Church 2017-2020,* Cokesbury Publishers, ISBN 13:9781501835773, 2017.)

The amendment further doubles down on the religious test by requiring the applicant to support the Bay View Association Mission statement. Thus, homeowners must support a mission, among other things, "to provide a Christian perspective in a changing world." While Bay View members, like Americans generally, should be free to voluntarily engage in religious practices, requiring such beliefs and practices as a condition of home ownership violates the law. It is difficult to conceive how a devout Jewish, Muslim, or Atheist willing buyer could prove that he or she would aid in offering the world a Christian perspective on life. In any case, it is not Plaintiff's burden here, but the Defendants' burden, to show that neither disparate treatment nor disparate impact discrimination is conceivable under its new bylaw, and Plaintiff urges the Court to hold Bay View to this predicate showing, if it wishes to employ the voluntary cessation case law.

Relative to that case law and the two prongs Defendants would have to show, Plaintiff first submits that the history and background reflected in Exhs. A-I foreclose a holding that discrimination is not capable of recurring in Bay View. In short, the background shows that Bay View became interested in stopping discrimination, if at all, upon seeing oral argument. Until literally the last moment, it did not entertain cessation of its practices—and even at the last second, leadership could not unanimously endorse the new (still unlawful) bylaw. After many years of refusing to end discrimination without a court battle, Plaintiff will be excused for

questioning the genuineness of the last ditch Hail Mary.[3]

Even if the history were not sufficient to show Defendants' true colors, Defendants removed all doubt of their intentions days after the new bylaw passed. In an email to the Bay View membership committee (the body that screens new would-be buyers within Bay View), sent just four days after the bylaw amendment vote, Bay View's President Jon Chism relayed what "the Board of Trustees believes" should be done to implement the new bylaw. First, he relayed that the wish of the current owners in general as demonstrated by survey information is "to keep Bay View as a Christian community," whatever the vote. Second, he directed that a "gate keeper of Bay View's Christian culture" was needed because of the bylaw change. The Board now expected "rigorous" screening of would-be buyers, with the membership committee "stepping-up" as this "gate keeper of Bay View's Christian culture." Specifically, anyone who was "of Christian persuasion" (i.e., who would "meet the former policy") could be approved for ownership right away, while anyone *not* so qualified (not Christian) would be held back and further scrutinized (how is not exactly stated). Moreover, the Board directed the Chair of the committee to give "confidential evaluation of the committee members," i.e., these "gate-keepers" of "Bay View's Christian culture," so that anyone involved in screening could be assured of being "supportive of this new responsibility." Exh. K.

Bluntly, this email is direct evidence of an intention to keep Bay View as Christian as possible and to enforce a two-tier process for Christians and non-Christians, while weeding out from the screening committee anyone who would *not* comply. It is a flagrant declaration of intentions by a Board that never wanted a change and now intends to do what it wants, under the

---

[3] Notably, Defendant has never admitted it violated the law; such a reckoning is pivotal for ensuring against backsliding or even assuring future compliance with the law.

13

radar, perhaps, through subtler means—at best. After some of the "gatekeepers" objected, the Board apparently realized it had made a pivotal, strategic blunder in showing its hand, so weeks *after* sending the above "gatekeeper" directive it mouthed that it would take more time to study the matter, would retreat from its directives to date and would of course in the future follow the law. However, this Court is not permitted to decide cases based on self-serving statements of future intentions, particularly in light of a long history of discriminating.

Turning to the second prong of the "voluntary cessation" test, there has been no interim relief or event irrevocably eradicating the harmful effects caused by Defendants' actions. In fact the most recent guidance to the Membership Committee indicates: (a) an intent on the part of its leaders to keep Bay View Christian; (b) recitation that most community members want it that way; (c) direction to fast track Christians and hold others for approval, then apply "rigorous" screening; and (d) a retaliatory intention to exclude from the screening body anyone not on board. This Court clearly cannot hold that Bay View's leadership has nothing but lawful intentions, based on this email. Meanwhile, harms to Plaintiff's members have not been reversed or eradicated—they still are excluded from ownership of Bay View cottages, still are prevented from selling their property on the open market, and otherwise continue to be harmed in all the ways outlined in their First Amended Complaint. Defendants simply cannot show a real "voluntary cessation" of discrimination, let alone the two prongs necessary to foreclose declaratory judgment and an injunction.

In fact, Plaintiff pleads with the Court that real people are still being treated less favorably based on religion, and have been for years, in violation of State and Federal law. The latest developments only show that will continue on—perhaps under the radar, via "rigorous" examinations, or by subtle control of the screening body membership, or by other artifice if need

be. But Defendants' leaders cannot demonstrate their bylaw is now fully lawful *and* they have changed and will not revert back to discrimination, *and* they have remedied past wrongs – and those are their affirmative burdens. They refused to come around for many years and took no time at all after the new bylaw passed to insist that everyone wants to "keep Bay View as a Christian community." Exh. K. This calls out for swift correction and underscores the need for an injunction now, before the harm mounts further.

## II. With Leave of the Court, Plaintiff Will Amend the Complaint to Update the Facts Concerning the New Amendment and Bring a New 12(c) Motion to Address It

This Court could enter a positive injunction ordering Bay View to cease all religious discrimination/screening forthwith. This would be based on its assessment of the admitted facts and briefing now before the Court, and (depending on the wording) would forestall the need to wrangle over the illegality of the *new* bylaw.

Alternatively, the Court could issue an order declaring the former practice unlawful under Rule 12(c), essentially entering a judgment of liability and enjoining future enforcement of the old bylaw—a step that would leave open a new set of facts under the new bylaws. In that case, Plaintiff would need to amend the complaint, cite the new bylaw, allege that it is *also* unlawful and file a second 12(c) motion specific to that new bylaw.

For all the reasons set forth above, Plaintiff does not believe the Court has other viable options consistent with our laws. However, if the Court denied the 12(c) motion, Plaintiff would amend the complaint, cite the new bylaw, and pursue claims that *both* the former and new practices are unlawful. This would include a second 12(c) motion specific to the new bylaw and discovery on the former practice/former bylaw.

## Conclusion

Defendants' bylaws changes do not obviate the need for this Court to consider and rule

15

on all of Plaintiff's claims, including those for injunctive and declaratory relief, as well as those for damages.

|  |  |
|---|---|
|  | Respectfully submitted,<br>SALVATORE PRESCOTT<br>& PORTER, PLLC |
|  | /s/ Sarah S. Prescott<br>Sarah S. Prescott (P70510)<br>Attorneys for Plaintiff<br>105 East Main Street<br>Northville, MI 48167<br>(248) 679-8711 |
| Dated:  September 11, 2018 | prescott@spplawyers.com |

### CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

|  |  |
|---|---|
|  | /s/ Sarah S. Prescott<br>Sarah S. Prescott (P70510)<br>Salvatore Prescott & Porter, PLLC<br>Attorneys for Plaintiff<br>105 East Main Street<br>Northville, MI 48167<br>(248) 679-8711 |
| Dated:  September 11, 2018 | prescott@spplawyers.com |